The issue in this case is whether the plaintiffs presented sufficient evidence of breach of contract, negligence, and fraud in regard to a lease-sale agreement to withstand the defendants' motion for a directed verdict.
The facts are as follows. In July 1987 David E. Ballew and his wife, Debra, contacted Charter Realty ERA to set up an appointment with a real estate agent. They met with Mary Lou Crigger, who showed them the home of Charles and Faye Woods. Several weeks later, on August 25, 1987, they looked at the property again, and upon return to Crigger's office they signed an offer of $130,000 and paid $1,000 earnest money to Charter Realty ERA. The contract was contingent on the Ballews' obtaining financing for $104,000.
Crigger telephoned the Ballews that same night and told them that their offer had been accepted. The Ballews then went to Altus Bank and applied for a mortgage loan to purchase the property. Several weeks later Crigger called the Ballews to tell them that the closing was to take place on September 30, 1987, at Asa Hartwig's office in Cullman.
After receiving this information, the Ballews began making moving arrangements, terminating the lease on their apartment and calling the furniture movers to ship their furniture to Cullman. When the Ballews arrived at Hartwig's office in Cullman on September 30, they discovered that their loan had not been approved. They then negotiated a series of documents, which included two real estate contracts on the property, a lease-sale contract, and a promissory note from the Ballews for $104,000 to the Woodses. The Ballews also paid $26,000 in cash to the Woodses.
The lease-sale contract reads in pertinent part as follows:
 "In the event that the loan is not approved by ALTUS BANK within thirty days (30) from the date of this agreement, the parties of the second part [the Ballews] agree to pay, beginning October 1, 1987, EIGHT HUNDRED TWENTY-THREE AND 33/100 ($823.33) DOLLARS a month to the parties of the first part [the Woodses] as interest for a maximum period of six months, or until such time [as] permanent financing can be obtained. Any unearned interest shall be prorated back to the parties of the second part if financing occurs prior to the interest being earned. And should the parties of the second part fail to pay the interest as it becomes due on the 1st day of each month thereafter, or violate any other condition of this Lease, the parties of the first part then have the right to demand the parties of the second part to amortize the balance of the note described above at the rate of ONE THOUSAND AND NO/100 ($1,000) DOLLARS per month until said note is paid in full."
The Ballews made the $823.33 in monthly payments under the terms of the contract for five months. During that time, the Woodses came to the Ballews' home to tell them that in December the Woodses' homeowner's insurance policy expired, and that the Ballews needed to get a policy in their own name. At that point, the Ballews had the property title searched. That search revealed that Bill Floyd was the owner of the property and that the Woodses did not own the house but only had an equitable interest in the house under the terms of a *Page 879 
lease-sale contract with Floyd.[1] The Ballews also discovered that the house had been appraised in January 1985 for $118,000.
In February 1988 the Ballews stopped making payments under the contract and contacted an attorney. The attorney wrote the Woodses a letter including, in pertinent part, the following:
 "Mr. and Mrs. Ballews [sic] have left a check with me in the amount of $823.33. This money has been placed in my trust account. The Ballews demand delivery to this office of a Warranty Deed with right of survivorship free of all encumbrances, from you to them on the subject property before April 1, 1988. On receipt of this deed the $823.33 will be paid to you."
On June 21, 1988, eight months after the contract was signed, the Ballews sued Charter Realty ERA, Crigger, and the Woodses, alleging fraud in inducing the Ballews to enter a contract for the sale of a home, misrepresentations as to the loan, concealment of material facts, negligence, willfulness, and wantonness. The Ballews later amended the complaint to allege that the defendants had previously committed acts constituting a similar scheme in other real estate actions involving a lease-sale contract. They also made an equitable claim for rescission of the contract and requested damages.
At the close of the plaintiff's evidence, the trial court granted the defendants' motions for directed verdict, stating:
 "[T]he Court has had considerable difficulty under the modern substantial evidence rule that the Plaintiffs did not offer evidence that should be submitted to the jury and that they intentionally and voluntarily went through the procedure concerning the real estate at a lawyer's office in Cullman and the problem arose when they could not finance through a lending institution the monetary coverage to consummate the transaction and a directed verdict is entered for the defendants, Charter Realty ERA, Mary Lou Crigger and Charles K. and Faye R. Woods and against the Plaintiffs, David E. Ballew and Debra Ballew."
The court entered a judgment on that directed verdict, and it denied the claim for rescission. This appeal followed.
When reviewing a directed verdict, this Court must examine the record to determine whether there was sufficient evidence to produce a conflict warranting jury consideration, viewing the evidence most favorably to the nonmovant. Ogle v. Long,551 So.2d 914 (Ala. 1989). If, by any interpretation, the evidence can support a conclusion in favor of the nonmoving party, we must reverse. Rose v. Miller Co., 432 So.2d 1237 (Ala. 1983).
Because this case was filed after June 11, 1987, the substantial evidence rule applies. Ala. Code 1975, § 12-21-12. "Substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founder's Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989).
 BREACH OF CONTRACT
The Ballews state that "the undisputed facts were that no deed was delivered and no abstract was delivered showing good and merchantable title by [April 1, 1988]," and that they were therefore entitled to rescind the contract and recover the earnest money deposited. However, good title was never caused to be delivered because the Ballews breached the contract in February 1988, prior to the date of closing, April 1, 1988.
The Ballews produced the following sales documents: the promissory note, two agreements of sale, and a lease-sale contract. Both of the agreements of sale stated: *Page 880 
 "The undersigned seller agrees to furnish purchaser an abstract of title . . . showing a good and merchantable title, free of encumbrances. . . . The sale shall be closed and the deed delivered on or before April 1, 1988, except that the Seller shall have a reasonable length of time within which to perfect title or cure defects in the title to said property."
Alabama law does not require that a seller have good title at the time of contracting for the sale of land. The seller must have good title when, by the terms of the contract, he is required to do so. Barksdale v. Temerson, 251 Ala. 495, 497,38 So.2d 5 (1948). Consequently, the Woodses were not required to give evidence of good title until the date of closing, April 1, 1988.
The record reveals that two weeks after the Ballews executed the lease-sale contract they learned from Altus Bank that their loan application had been denied. They then applied to at least two more banks for a loan. Both of these institutions refused to lend the money, because of the Ballews' debt-to-earnings ratio.[2] Mr. Ballew's testimony at trial revealed the following concerning the reason the Ballews had to move out of the house:
 "Q. (By Mr. McDorman) [on direct examination]: After you were turned down for the financing through the other two banks, didn't you determine that you could not afford the payments under the lease-sale agreement?
 "A. Yes. We had already told everybody, we said that we didn't think we could afford it.
 "Q. You didn't do that because you couldn't get the financing; is that correct? You could not afford it under the lease-sale contract?
 "A. Yes. We said that back at the closing with Mrs. Crigger.
 "Q. When you didn't get the financing, then when did you decide to move?
"A. It was along about the end of February.
"Q. So you and your wife moved out?
"A. Yes.
"Q. And you made no further payments?
"A. No further payments."
During cross-examination, Mr. Ballew further testified that they did not make the six monthly payments as required under the lease-sale contract before the Woodses were to deliver them a deed:
 "Q. You knew on the occasion that a demand was made of the Woodses that they deliver to you a deed immediately, you knew you hadn't made the six monthly payments, didn't you? . . . .
". . . .
"Q. From February, March, April —
 "A. We paid through February when we moved out. We made all those payments.
 "Q. And you knew that you had to have financing to pay the amount at closing, didn't you?
"A. Yes.
"Q. But you didn't have that financing, did you?
"A. No.
Under the terms of the lease-sale contract, when the Ballews failed to pay the monthly payments as they came due in March and April, the Ballews breached the contract. The Ballews failed to produce substantial evidence of a breach of contract by the defendants to withstand the defendants' motion for a directed verdict. Therefore, the trial court did not err in directing the verdict in favor of the defendants on the breach of contract count.
 FRAUD
The Ballews argue that the trial court erred in directing a verdict for the defendants because they say this case presents several questions for the jury to resolve regarding whether the following alleged representations constituted actionable fraud: 1) that the Altus loan would be approved and that there were no problems *Page 881 
with its approval; 2) that the closing was only a formality and would have no effect; and whether the alleged concealment of the following constituted actionable fraud: 1) that the mortgage on the property was not owned by the Woodses but by Mr. Floyd; and 2) that the Woodses had only a lease contract with an option to purchase the property. They also contend that the misrepresentations were made willfully or with reckless disregard for their truth or falsity, and that they therefore are entitled to recover punitive damages in addition to compensatory damages.
For a claim of misrepresentation to go to the jury, a plaintiff must put forth evidence of each element of fraud — that there was 1) a misrepresentation, 2) concerning a material fact, 3) relied upon by the plaintiff, 4) who must, as a proximate result of the misrepresentation, have sustained loss or damage. Underwood v. Adamson Ford, Inc., 564 So.2d 51,53 (Ala. 1990).
The Ballews allege that Crigger misrepresented to them that there was no problem with their loan being approved by Altus and that she was "sure that it was going through." Mrs. Ballew testified as follows:
 "A. Mrs. Crigger said that the loan to Altus hadn't been completed, that all they were waiting on was the appraisal, that the credit part had been approved and that she had done some creative financing so that we could take possession of the house because our closing date was the 25th, was supposed to be the 25th, and she explained a document that she had. She said that it was a —
"Q. Was that a lease-sale?
 "A. That it was the lease-sale agreement, and she explained it as we were reading it and we had some objections to it.
"Q. What were those?
 "A. All right. We told her that this was supposed to be a closing with Altus and that this wasn't what we wanted. And also it said after six months, we would be paying $1000 a month. It didn't have — well, anyway, we told her we couldn't afford it. There was no way we could make a $1000 a month payment. She told us that this was temporary so we could get possession and that the paperwork was a formality.
"Q. You're talking about the lease-sale?
 "A. The lease-sale agreement. It would never come to us paying $1,000 a month, that the loan was fine, that the appraisal should be shortly, they hadn't scheduled it yet."
Because Crigger was speaking of an act to take place in the future, the Ballews must prove not only falsity, reliance, and loss or damage, but also that when the statement was made there was an actual fraudulent intent not to perform the act promised and an intent to deceive the plaintiff. See Hearing Systems,Inc. v. Chandler, 512 So.2d 84, 87 (Ala. 1987).
The Ballews cite Jackson Co. v. Faulkner, 55 Ala. App. 354,315 So.2d 591 (Ala.Civ.App. 1975), as determinative in this case. In Jackson, the plaintiff purchased a lot from a real estate broker; many years before the transaction, the broker had been informed by the health department that it would not approve a septic tank on the lot because there were inherent problems with ground water. When the plaintiff asked the broker if he could get a septic tank on the lot, she responded by saying that if the lot had "perked" he was okay and that she did not think that he would have any trouble getting a septic tank. Relying on the broker's representation, the plaintiff purchased the lot. The Court of Civil Appeals held that there was a scintilla of evidence of a material misrepresentation to warrant submission to the jury. Id. at 360.
In contrast, the Ballews presented no evidence that Crigger knew, when they executed the lease-sale agreement, that Altus would not approve the loan. In her affidavit Crigger stated:
 "I called Marlene at Altus Bank in Decatur and told her the situation. Marlene said that the [Ballews'] loan should go through, it looked good but she could not guarantee it." *Page 882 
She then stated that she relayed this information to the Ballews. The record shows that Crigger merely expressed her opinion that she felt sure the loan would go through. A statement of opinion by a real estate agent cannot be used to impose liability on the agent as if it were a statement of fact. Harrell v. Dodson, 398 So.2d 272 (Ala. 1981).
Whether a given representation is an expression of opinion or a statement of fact depends upon all the circumstances of the particular case. Jackson Co., 55 Ala. App. 354, 362,315 So.2d 591, 598. Mr. Ballew was a college graduate with a business degree and had been the office manager of a contracting company for 10 years at the time of the contract. As office manager, it was his responsibility to do the accounting functions — auditing invoices for payment, etc.
Further, in the seven years before the contract in question, Mr. Ballew had bought and sold three houses. He testified that he had to obtain a loan to buy each house, that none of the houses was paid for when he sold it, that none of the mortgages was paid off before he closed the sale, and that none of his purchasers paid him "outright cash" for the property. Consequently, Mr. Ballew had been involved in six transactions involving loans to finance the purchase of houses, three times as a buyer and three times as a seller.
The Ballews also testified that they knew when they signed the lease-sale agreement that their loan had not yet been approved. Mr. Ballew also testified that he knew from his experience that if the property was not appraised at a sufficient amount or did not meet the lending agency's requirements, then he would not get the loan. Nevertheless, the Ballews negotiated a lease-sale agreement conditioned upon the approval of their loan. We hold that the trial court correctly ruled that the Ballews should have discovered the true status of the loan application with Altus bank before entering the lease-sale agreement.
Considering the subject matter of the representation and the knowledge and intelligence of the parties, we hold that the trial judge correctly concluded that Crigger's representation concerning the outcome of the Ballews' application for a loan from Altus was not a statement of a fact that was known to be false or that was so recklessly made as to amount to a knowing misrepresentation.
The Ballews also argue that Crigger misrepresented to them that the closing was only a formality and would have no effect. Considering the Ballews' knowledge and experience concerning the buying and selling of houses and the importance of the legal documentation thereof, this argument has no merit. The alleged misrepresentation was so "patently and obviously false that [the Ballews] must have closed [their] eyes to avoid the discovery of the truth." See Hickox v. Stover, 551 So.2d 259
(Ala. 1989). We hold that reliance upon this statement was unjustified as a matter of law. The trial judge did not err in directing a verdict on the misrepresentation count.
The Ballews also argue that the defendants concealed the fact that the Woodses did not own the property, but only leased it from Mr. Floyd. Under Alabama law, a defendant may be liable for legal fraud for the failure to disclose a material fact. A "material fact" has been defined as "one that induces action by the complaining party." Cory v. Carpenter, 510 So.2d 546, 547
(Ala.Civ.App. 1986).
 "Where one responds to an inquiry, it is his duty to impart correct information, and he is guilty of fraud if he denies all knowledge of a fact which he knows to exist, or if he gives equivocal, evasive, or misleading answers calculated to convey a false impression, even though literally true as far as they go, or if he fails to disclose the whole truth."
Boswell v. Coker, 519 So.2d 493 (Ala. 1987).
As we stated earlier, the Woodses were not required to have good title until the terms of the contract required them to do so. See Barksdale, 251 Ala. 495, 38 So.2d 5. Our review of the record reveals that there was no testimony that the Woodses directly represented to the Ballews *Page 883 
that they owned the property. Furthermore, there was testimony that if Floyd had received the money from the Woodses in March or April 1988 he could have delivered the deed to them at that time.
Mr. Ballew testified that if he had been told that the Woodses did not have legal title to the property in question, it would have made a difference as to whether he signed the papers. However, the contract indicates that the Woodses did not have to furnish proof of clear title until April 1, and the agreement provided that the Woodses "shall have a reasonable length of time within which to perfect title or cure defects in the title."[3] Consequently, as of the time of their breach, the Ballews had suffered no damage from the alleged misrepresentation that the Woodses owned the property in fee simple.
 RESCISSION
The Ballews finally contend that to enforce the contract and to deny them relief is inequitable, and that they are entitled to rescind the contract. The defendants argue that the equitable principle of rescission was never pleaded at any stage in this action until the Ballews raised it for the first time on their motion for new trial, and that the trial judge cannot be held in error for failing to grant equitable relief to the plaintiffs when it was never asked for prior to trial. We find the defendants' arguments in this regard to be without merit. In count three of the original complaint, the Ballews realleged the facts of the alleged fraud and made a demand for the return of monies paid. They pleaded a vacation of the premises, and asked that the "contract to sale [sic] real estate be rescinded."
Indeed, "forfeitures are not favored in equity and unless the penalty is fairly proportional to the damage suffered, relief will be granted when the court can give by way of compensation all that can reasonably be expected." Humphrey v. Humphrey,254 Ala. 395, 48 So.2d 424 (1950). If the Woodses could not furnish good and marketable title, as called for in the purchase agreement, the Ballews would be entitled to rescind the contract and recover any earnest money deposited.
We recognize that this case was tried before a jury, but we must construe the pleadings most liberally in favor of the plaintiffs, who pleaded a claim for rescission of the contract. The allegations of fraud and the additional demand for rescission are all that would be needed under notice pleading to put the defendants on notice that the Ballews were seeking equitable relief. A.R.Civ.P. Rule 8. The trial judge erred in denying this equitable claim for relief without considering it.
The judgment of the trial court on the legal claims is affirmed, but the denial of the equitable claim is reversed, and this cause is remanded for the trial court to review the equitable claim made by the Ballews.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
ADAMS, HOUSTON, STEAGALL, KENNEDY and INGRAM, JJ., concur.
HORNSBY, C.J., and SHORES, J., concur specially.
[1] There were no restrictions in the sales agreement with Floyd against the Woodses' right to enter into a sales agreement with someone else.
[2] The appellees also point out that within one year a mortgage was taken on this same property by the Woodses.
[3] We note that the Woodses purchased the property and received the deed to the property in question from Floyd in May 1988. It was after that time that Floyd satisfied his mortgage on the property.